## CHARLESTON.

Reserve Gas Co. *v.* Carbon Black Manufacturing Co.

Submitted June 14, 1912.   Decided September 30, 1913.

1. Evidence—*Landlord and Tenant—Lease —Description of Premises.*

    A call for an adjoining tract of land as a boundary of the leased premises in a lease containing but one description of the premises demised, which description is clear, certain and unambiguous, cannot be ignored or rejected, in the judicial interpretation and application of the description to its subject matter; nor is it permissible to show, by parol evidence, facts and circumstances tending to prove intent, on the part of the lessor, not to lease part of the land included by the description. (p. 761).

2. Same—*Parol Evidence—Admissibility.*

    Nor is it permissible to show, in contradiction of the terms of the lease, that it was verbally understood or agreed that the lessee was not to have a portion of the land its terms include. (p. 763).

3.  MINES AND MINERALS—*Oil Lease—Forfeiture.*

An oil and gas lease binding the lessee to drill a well on the leased premises within a certain period, or, in lieu thereof, make periodical payments of rental or delay money, and containing no clause of forfeiture, is not forfeitable merely by nonpayment of the rental. It can be terminated only by surrender, abandonment or expiration of the term.  (p. 763).

(LYNCH, JUDGE, absent.)

Appeal from Circuit Court, Lewis County.

Bill by the Reserve Gas Company against the Carbon Black Manufacturing Company and others. Judgment for plaintiff, and the Manufacturing Company appeals.

*Affirmed.*

*Robert L. Bland,* and *Davis & Davis,* for appellant.

*A. B. Fleming, Charles Powell,* and *Kemble White,* for appellee.

POFFENBARGER, PRESIDENT:

Upon the bill of the Reserve Gas Company, praying cancellation of a lease, for oil and gas purposes, upon a small area of land, containing one acre, three roods and one-half a pole, executed by Charles Butcher and wife to the Carbon Black Manufacturing Company, a corporation, and an injunction to restrain the defendants from operating or drilling upon said tract of land for oil and gas or from taking or removing any oil or gas therefrom, the circuit court of Lewis county decreed cancellation of the lease and perpetually enjoined operations thereunder; and from this decree the Carbon Black Manufacturing Company has appealed.

The conflicting claims set forth in the pleadings and the issues made arise out of the following facts: Owning two parcels or lots carved out of a tract of land formerly belonging to Thomas Butcher, one containing 25.5 acres and the other 11 acres, according to the specifications of quantity in the deeds, Granville A. Butcher, on September 13, 1889, executed to one Fretts an oil and gas lease thereon, representing the combined area to be 49 acres. This lease for a term of 20 years was after-

ward assigned to one Ira DeWitt, of Pittsburg. On the 23d day of November, 1893, Granville A. Butcher, by a deed from Louis Bennett, Special Commissioner, obtained another small portion of the Thomas Butcher land, which had been conveyed by Thomas Butcher to Emmanuel Butcher. Between what he had previously owned, and the lot obtained by the Bennett deed, containing one acre ,three roods and one-half a pole, there was a county road, the small lot lying north of it, and the large tract south. On the northeast of the larger tract, the one included in the Fretts lease, ran the West Fork River, and on the southeast it was bounded for the most part, by a tract of land owned by Elizabeth Ervin. On the southwest lay lands of C. D. Devinney and C. A. Peters and on the west and northwest were lands of H. B. Butcher and M. E. Butcher. The small tract acquired by the Bennett deed was bounded on the north and the west by a tract of land containing 21.98 acres which had been conveyed by Thomas Butcher to Wm. E. Arnold, who devised it to Wilson A. Arnold, by his will probated July 23, 1890. Granville A. Butcher, did not own the one acre, three roods and one-half a pole tract at the date of the Fretts lease, but he did own it on the 8th day of August, 1900, the date of the oil and gas lease to the South Penn Oil Company for a term of ten years or as long as oil or gas or either of them should be produced from the land, and describing the premises as "bounded substantially as follows: On the north by the lands of Wm. A. Arnold and others. On the east by lands of A. W. Woodford and others. On the south by lands of M. Ervin and others. On the west by lands of C. D. Devinney and others. Containing 49 acres more or less." The Frett's lease gives the boundaries as follows: "On the north by West Fork River. On the east by lands of M. Ervin. On the south by lands of C. Flesher & C. Devinney. On the west by lands of Wm. Arnold & others," containing 49 acres more or less. On the 4th day of June, 1897, Granville Butcher leased the small lot north of the road to E. W. Boyd for oil and gas purposes for a term of five years, and, on the first day of June, 1899, to the Eastern Oil Company for like purposes for a term of ten years. On January 1, 1907, he conveyed the land by deed to his son, Charles Butcher. The Eastern Oil Company's lease having expired, Charles Butcher, on July 12, 1909,

executed a new lease on this lot, to the Carbon Black Manufacturing Company, which company began a well on the premises March 16, 1910, and completed the same April 20, 1910.

Though there is no proof of the assignment of the Fretts lease to the South Penn Oil Company, John Butcher, a son of the lessor, says Thos. H. Kemper, one of the agents of the South Penn Oil Company, who took the lease of August 8, 1900, said, on the occasion, he had come to re-lease the property at one dollar an acre instead of ten cents an acre, the rental provided for in the Fretts lease, and further that Kemper had the Fretts lease with him at the time. John Butcher further testified that Kemper was informed on that occasion by the lessor, Granville A. Butcher, that the small tract of land in question was already under a lease to the Eastern Oil Company. Practically all of this testimony is denied by Kemper.

As recorded, the lease of August 8, 1900, contains this clause, relating to the payment of rentals or delay money: "Such payments may be made direct to the lessor or deposited to ———— credit in —————————." The original lease, put in evidence along with a certified copy of it as recorded, contains this clause: "Such payments may be made direct to the lessors or deposited to their credit in the National Exchange Bank of Weston, W. Va." The rentals were paid regularly but not always to the lessor in person. Sometime before this controversy arose, the lessor died, and, after his death, some of the rentals were paid into the bank to the credit of his heirs.

The oil and gas rights vested in the South Penn Oil Company by its lease were assigned to the Hope Natural Gas Company in April, 1902, and by it to the Reserve Gas Company November 1, 1902.

In February, 1910, the Reserve Gas Company, having discovered preparations by the Carbon Black Company for drilling on the small tract of land in question, gave notice of its adverse claim under the South Penn Oil Company lease and advised that any operations by the Carbon Black Company under its lease would be at its own peril. At this time, the Carbon Black Company had done very little towards the development of the property. Later, it expended about $6,000.00 in the drilling and equipment of the well, which produced about 4,000,000 feet of

gas a day, and about $30,000.00 in the erection of its plant on the lot. Process was issued in this cause on May 3, 1910, and the bill was filed at June Rules, 1910.

Alleged ambiguity in the description of the leased land is relied upon in argument as justification for consideration of the surrounding and attendant facts and circumstances within the knowledge of the parties as showing their intention and authorizing rejection of the call for the Arnold tract of land as the northern boundary. If that call is to be respected and applied literally, the lease includes the small tract north of the county road, the one on which the Carbon Black Manufacturing Company has its lease and upon which it has drilled a producing gas well, for, if that tract is omitted, the Arnold tract does not touch nor bound the property at any point. It lies directly north of the remaining land owned by Granville A. Butcher at the date of the lease, but the small tract purchased at the judicial sale, conveyed by Bennett, Special Commissioner, lies between them. Though the call is for the lands of Wm. A. Arnold and others, and there are no lands of others lying directly north, except the Charles Butcher lot, the Arnold land is called for as a boundary with others, and, if the Charles Butcher lot is excluded from the lease, the Arnold land is not a boundary at all. 'As there is a definite and positive call for that land as a boundary, we are unable to perceive how it can be rejected on the ground of uncertainty or indefiniteness. The western boundary line is irregular, the general course being northeast and southwest, wherefore it may be reasonably said the call for the Arnold land and others is intended to include lands of H. B. Butcher which in some respects is the western boundary and in others a northern boundary. A plat filed in the cause by one of the surveyors has the word "Arnold" on it at a point east of the West Fork River and rather northeast of the original Granville A. Butcher land, but there is no proof of the existence of any Arnold land at that point, and, if there were, it would not lie directly north of the Butcher land. Some of the other calls for boundaries are less apt and accurate than that of the ones just discussed. The lands of M. Ervin and others are called for as the southern boundary. The Ervin land constitutes more nearly an eastern, than a southern, boundary, but it lies to the southeast. The

lands of C. D. Devinney and others are called for as the western boundary. The Devinney land lies more nearly south than west, and the western boundary would be more accurately expressed by calling for the lands of H. B. Butcher and M. E. Butcher. However, the Granville A. Butcher tract, lying south of the county road, can be located by these calls without doing any violence to the terms used, and the description, as a whole, including the Chas. Butcher lot, has all the certainty the law requires. Nothing found in the terms used or disclosed by extraneous evidence creates any uncertainty or ambiguity in it. On the face of the paper, we find no repugnance or inconsistency. Effect can be given to every part of the description, notwithstanding the slight inaccuracies adverted to, and literally and fully applied, it includes the small tract of land in controversy. It cannot be excluded without rejecting the call for the Arnold land. If the lease contained two descriptions, one general and the other particular, and the two differed as to the quantity or identity of the land in question, the circumstances and situation of the parties, evincing intent, might be permitted to control. *Mylius* v. *Lumber Co.,* 69 W. Va. 346, 361; *Baxter* v. *Tanner,* 35 W. Va. 60; *Smith* v. *Chapman,* 10 Gratt. 445; *Rutherford* v. *Tracy,* 48 Mo. 325; *Masterson* v. *Munro,* 105 Cal. 431. But this lease contains only one description. Butcher had formerly leased his two tracts south of the county road as a single one, specifying 49 acres as the quantity, and his lease to the South Penn Oil Company again specified 49 acres as the quantity, notwithstanding the description inserted includes the small tract which he had purchased between the dates of the two leases, but he had no land popularly known as a 49-acre tract. The mere circumstance of a single lease of two tracts as containing 49 acres is wholly insufficient to establish a reputation or designation for general purposes. The terms "Home Farm" or farm on which the grantor or testator resides, give a means of identification which, differing from the particular description, may control; or, if the granted, devised or leased premises is designated by the name of a former owner from whom it has been purchased or inherited, the words give an unerring index to the location and boundary. But the statement of a quantity is a very uncertain

one. It does not purport to be a designation or description. It is a mere statement of the quantity of land otherwise described and is often immaterial. The specification of the quantity or area in the lease, taken in connection with the fact that the land had formerly been leased as containing the same quantity, is the only thing in the lease or the evidence that might be regarded as in any sense a general description, and, as it does not amount to that, for the reasons stated, there is no ambiguity, justifying the admission of the circumstances relied upon as ground for rejection of the particular description or any portion thereof.

All the circumstances relied upon as indicating intent contrary to that expressed in the lease rest in parol evidence. The lease does not in any manner mention or refer to them. It does not show any separation of the Charles Butcher lot from the other lands of Granville Butcher by county road or fences, nor that it was never considered or used by Granville Butcher as a part of his home farm, nor that there were other leases on it, nor that it was under lease to the Eastern Oil Company at the time the South Penn Oil Company lease was executed. Being inconsistent with the written terms of the lease and contradictory thereof, and the lease itself being free from ambiguity, these circumstances are inadmissible in evidence. *Oil Company* v. *Knox,* 68 W. Va. 362; *McCoy* v. *Ash,* 64 W. Va. 655; *Long* v. *Perine,* 41 W. Va. 314. Nor is it permissible to show contradiction of the terms of the lease by a parol understanding or agreement that the small tract was not to be included. Neither antecedent nor contemporaneous parol agreements are permitted to vary or contradict the terms of a written contract which is legally deemed to be the final and deliberate repository of the terms and provisions of the contract. *McCoy* v. *Ash,* cited; *Knowlton* v. *Campbell,* 48 W. Va. 294; *Howell* v. *Behler,* 41 W. Va. 610.

An averment and claim of forfeiture of the South Penn Company lease as to the Charles Butcher tract was founded upon failure of the claimants under it to pay the rentals directly to the heirs of the lessor after his death instead of payment thereof into the National Exchange Bank to their credit, under that provision of the original lease authorizing such payment which

was only partially recorded, as has been shown. The lease was on a printed form in which space was left for designation of a bank for such purpose. A large amount of evidence tending to prove the blanks in question were filled before the lease was recorded, consisting of the testimony of the agent who took the lease and agents, clerks and officers in the office of the South Penn Company, and books and papers from its files, is unopposed by anything except the failure of the clerk to enter upon the deed book, in copying the lease, the words written in the blanks. For all that appears, these words were omitted by mere inadvertence, and the testimony just referred to very strongly tends to show they were so omitted. But the admissibility of this evidence is denied in argument under the rule forbidding collateral attack upon judicial and quasi-judicial acts and proceedings, such as were performed by the clerk in admitting the lease to record. The evidence was neither offered nor introduced for the purpose of impeaching the record or amending it, but only to show the contents of the original lease. The purpose was not to change the character of the lease as a recorded one, but to prove it as an unrecorded lease. The original lease was admissible in evidence, notwithstanding admissibility of a certified copy thereof under the provisions of the statute and the rule adopted by the Virginia Court before the passage thereof. *Thrasher* v. *Ballard,* 33 W. Va. 285; *Carper* v. *McDowell,* 5 Gratt. 212; *Baker* v. *Preston,* Gilmer (Va.) 235. The rentals accruing under the lease were all paid to Granville A. Butcher until the date of his death, sometime in 1908. Afterwards, they were paid in part to his heirs and partly into the bank to the credit of his heirs and devisees, but no payments were made to Charles Butcher, the owner of the lot here involved. Both the South Penn Oil Company and the Reserve Gas Company, by way of excuse for non-payment to him, deny notice of his ownership of this lot. He gave them no actual notice thereof, and, as they are not subsequent purchasers, recordation of his deed is not constructive notice to them.

Without entering upon an inquiry as to whether there was a technical forfeiture, and, if so, whether equity will relieve under the circumstances of the case, treating the lease as one terminable by failure to drill a well within a stipulated time or

pay commutation money, it suffices to say the lease in question was not of that character.  It contains no forfeiture clause, and the lessee covenanted and agreed to drill a well within a certain time or pay a stipulated rental.   There was a right of surrender on the part of the lessee, guaranteed by a stipulation in the lease, but no clause of forfeiture.  Until termination of the lease by surrender, or expiration of the term, the lessee was bound by an express covenant to pay the rental, in default of drilling a well.  Under familiar principles frequently declared by this Court, there might have been a termination by abandonment, but all the facts and circumstances adduced in evidence negative any intent on the part of the lessee to abandon the lease, and the lessor, acting at his peril, attempted to assert a claim of termination by abandonment, as did all owners claiming under him.   Clearly there was no forfeiture, nor is there evidence sufficient to make out a case of termination by abandonment.

Upon these principles and conclusions, the decree complained of will be affirmed.

*Affirmed.*